No. 666          July 15, 2026          485

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

SPECIALTY FAMILY HOMES LLC
and Joan Schrader,
*Petitioners,*

*v.*

DEPARTMENT OF HUMAN SERVICES,
OFFICE OF DEVELOPMENTAL DISABILITY SERVICES,
*Respondent.*

Department of Human Services
A183802

Argued and submitted October 23, 2025, Ridgeview High School, Redmond.

Nathan R. Morales argued the cause for petitioners. Also on the briefs were Kaitlyn K. Lindaman and Stoel Rives LLP.

Inge D. Wells, Assistant Attorney General argued the cause for respondent. On the brief were Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Leigh A. Salmon, Assistant Attorney General.

Before Ortega, Presiding Judge, Joyce, Judge, and O'Connor, Judge.

JOYCE, J.

OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35) held valid.

**JOYCE, J.**

In this rule challenge brought under ORS 183.400, petitioners challenge the validity of OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35),[1] rules related to Medicaid benefits for adults with developmental disabilities living in the community. In two assignments of error, petitioners argue that the Oregon Department of Human Services (ODHS) exceeded its statutory authority when it adopted OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35), and that the rules violate constitutional anti-discrimination provisions, because they "significantly limit the freedom of individuals with developmental disabilities to choose where, and with whom, they want to live." We conclude that the rules are valid.

As explained further below, through a Medicaid program, Oregon provides in-home services, called community living supports (CLS), to individuals with developmental disabilities to allow them to live in their own home and community. The rules at issue relate to eligibility for CLS benefits. OAR 411-450-0060(6) limits eligibility for those services and states that a person is ineligible for CLS if the person lives in a dwelling or other setting that is owned, rented, controlled, or operated by a provider being paid to provide the services unless that provider is a family member of the person (related provider). OAR 411-450-0020(34) and (35) define a "Provider-Owned Dwelling" and a "Provider-Rented Dwelling" as a dwelling that is owned or rented by a provider or the provider's spouse who is paid for delivering services and is not related to the person by "blood, marriage, or adoption" (unrelated provider).

Petitioners are providers of services to unrelated individuals with developmental disabilities. First, petitioners argue that ODHS exceeded its statutory authority by promulgating the rules because the rules contravene various Oregon and federal statutes by impermissibly limiting a person's benefits based on where they choose to live and who

---

[1] The subsection numbers of the definitions in OAR 411-450-0020 have changed since the briefing in this case, resulting in revised subsection numbers for the sections at issue. Those changes do not affect our analysis, so we use the current subsection numbers.

they choose to provide their services. Second, petitioners argue that the rules violate both state and federal constitutional anti-discrimination provisions because they discriminate against individuals with developmental disabilities depending upon those choices. As explained below, given the text and context of the statutes at issue, ODHS did not exceed its statutory authority under either Oregon or federal law because the rules do not conflict with the statutory provisions identified by petitioners, and ODHS's authority to regulate living settings is not limited in the manner asserted by petitioners. Furthermore, the rules do not violate constitutional anti-discrimination provisions because they are rationally related to the legitimate government interest of protecting the health and safety of individuals with disabilities receiving services.

## I.   STANDARD OF REVIEW

Under ORS 183.400, "any person may petition this court to determine the validity of a rule." *Assn. of Acupuncture v. Bd. of Chiropractic Examiners*, 260 Or App 676, 678, 320 P3d 575 (2014) (internal quotation marks omitted). In reviewing a facial rule challenge under ORS 183.400, "we may declare the rule invalid only if we conclude that it violates constitutional provisions, exceeds the statutory authority of the agency that adopted the rule, or was adopted without complying with rulemaking procedures." *Id.* (citing ORS 183.400(4)). We examine only the rules as written, the statutory provisions authorizing the rules, and documents "necessary to demonstrate compliance with applicable rulemaking procedures." ORS 183.400(3). Petitioners argue that two of the three grounds for invalidating rules are present here: they exceed ODHS's statutory authority and they violate constitutional provisions.

## II.   BACKGROUND

To understand petitioners' arguments, we begin with the regulatory scheme under which this dispute falls.

A.   *Medicaid*

Under Oregon law, adults with developmental disabilities that result in significant impairment in major life

activities are entitled to developmental disability support services and to have those services provided in a manner that is the least restrictive to their liberty, specifically in their community, as opposed to an institutional environment. ORS 427.007(4); ORS 427.121(1); OAR 411-320-0080. Those support services include the "resources, services, and purchases necessary for an individual with a developmental disability to achieve identified personal goals and maximize self-determination." ORS 427.101(5); ORS 427.154. ODHS is the entity responsible for delivering and administering services for people with developmental disabilities in Oregon. ORS 409.010(2).

For low-income Oregonians with particularly severe disabilities, the state offers Oregon's Community First Choice State Plan Option (K Plan), a Medicaid program that provides CLS to individuals who are determined to "require an institutional level of care [and] *** that, but for the provision of such services, the individuals would require the level of care provided in a hospital *** [or] an intermediate care facility for the mentally [disabled]." 42 USC § 1396n(k)(1). CLS services include "attendant care, skills training, and relief care." OAR 411-450-0020(9). Specifically, "attendant care" means "an hourly service that provides assistance with activities of daily living, instrumental activities of daily living, and health-related tasks through cueing, monitoring, reassurance, redirection, set-up, hands-on, standby assistance, and reminding." OAR 411-317-0000(19); OAR 411-450-0020(4) ("'Attendant Care' is defined in OAR 411-317-0000 and described in OAR 411-450-0060.").

ODHS receives any Medicaid funds paid by the federal government to enable it to provide those services. ORS 409.010(3). In administering the services, ODHS must abide by federal statutory and regulatory mandates, along with applicable state statutes. ORS 409.010(2); ORS 409.040. For example, ODHS must conduct assessments to determine what assistance the individual needs, provide or exclude specific services, establish "a comprehensive, continuous quality assurance system," and "maximize consumer independence and consumer control." 42 USC § 1396n(k)(1), (3). Further, ODHS must provide the services and supports "in

the most integrated setting appropriate to the individual's needs, and without regard to the individual's age, type or nature of disability, severity of disability, or the form of home and community-based attendant services and supports that the individual requires in order to lead an independent life." 42 USC § 1396n(k)(3)(B). In short, to receive federal funding for the K Plan, ODHS must provide "individuals with disabilities who otherwise qualify for institutional care under the State plan or under a waiver the choice to instead receive home and community-based services in lieu of institutional care." 42 USC § 1396n(k)(3)(E).

B.    *Oregon Regulations*

Along with delivering developmental disability services, ODHS's duties include licensing and regulating the "individuals, facilities, institutions and programs" that provide those services. ORS 409.010(2)(f). State statutes dictate licensure requirements for some types of individuals, facilities, institutions, and programs providing services to individuals with disabilities. *See, e.g.*, ORS 443.725 (establishing licensure requirements for adult foster care homes). The legislature has empowered ODHS to "adopt such administrative rules as the director considers necessary to carry out" its functions. ORS 409.050(1).

As relevant here, under ODHS administrative rules, a person is eligible for CLS if they live in a setting that they own, lease, or rent, or are on the property deed, mortgage, or title; live in a setting owned, leased, or rented by a family member; or have no permanent residence. OAR 411-450-0060(6)(a). In those circumstances, the setting itself—the physical home or apartment—does not need to be licensed; the rule requires only that the person being paid to provide the services be qualified to do so. The provider may be the person's family member or someone else qualified by the state who comes to the home to provide services.

A person is not eligible for CLS if they reside in a provider-owned or -rented dwelling, or a "provider owned, controlled, or operated setting, including a setting owned, controlled, or operated by an employee of a provider agency." OAR 411-450-0060(6)(b). A provider-owned or -rented dwelling

is a dwelling that is either owned or rented "by a provider or the provider's spouse, when the provider is proposing to be paid for delivering home and community-based services to an individual, and the provider or the provider's spouse is not related to the individual by blood, marriage, or adoption." OAR 411-450-0020(34), (35). Thus, if an individual who is otherwise eligible for CLS lives in a space that is owned or rented by the person being paid to provide those services, and they are not related, the individual is not eligible for CLS in the home.

Despite ineligibility for CLS, an adult with developmental disabilities may still receive developmental disability services when living in a dwelling owned or rented by their unrelated provider, as long as the setting is licensed as an adult foster home. ORS 443.725(1) ("Every provider of adult foster care must be licensed with the licensing agency before opening or operating an adult foster home caring for adult residents."). An "adult foster home" is "any family home or facility in which residential care is provided in a homelike environment for five or fewer adults who are not related to the provider by blood or marriage." ORS 443.705(1). A "provider" is "any person operating an adult foster home" and does not include the owner or lessor of the building or land on which the adult foster home is located "unless the owner or lessor is also the operator of the adult foster home." ORS 443.705(4). "Residential care" is defined as "the provision of room and board and services that assist the resident in activities of daily living, such as assistance with bathing, dressing, grooming, eating, medication management, money management or recreation." ORS 443.705(5). Like CLS, adult foster homes are intended to "provide needed care and services to thousands of Oregonians who *** have disabilities and who might otherwise be institutionalized." ORS 443.720(1)(a).

## III.   ANALYSIS

Petitioners challenge the administrative rules that prohibit CLS eligibility if a person lives in a dwelling owned or rented by their provider who is unrelated to them. Petitioners argue that the rules exceeded ODHS's statutory authority and that they violate state and federal

constitutional equal protection provisions because ODHS is obligated to provide the services to individuals in the setting of their choice by providers of their choice. We first consider whether ODHS exceeded its statutory authority before turning to petitioners' constitutional arguments. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984) (we consider statutory authority arguments first "to assure that the challenged action, particularly an action challenged for arguably violating constitutional rights, in fact was authorized by the state's or local government's politically accountable policy makers. Only if the action was clearly so authorized is there any reason to decide whether the state or local government has adopted a policy that the constitution forbids").

A.    *ODHS acted within its statutory authority.*

Petitioners argue that ODHS exceeded its statutory authority because the rules conflict with its federal and state obligation to ensure that adults with developmental disabilities have access to community support services from the provider of their choice in the setting of their choice. Petitioners contend that ODHS did not have authority to promulgate the challenged rules because the rules conflict with its obligations under ORS 427.007(1)(a) and ORS 430.662 (1)(a)(A) and (B); ORS 427.121; federal Medicaid law; and the federal Fair Housing Act. Put simply, the question is: do any of those statutes prohibit ODHS from placing limitations on CLS eligibility in provider-owned or -rented living settings if the individual wishes to both live in that setting and receive services from that provider? We conclude that ODHS acted within its statutory authority in enacting the rules and that the rules do not conflict with the statutory provisions identified by petitioners because ODHS's regulatory authority is not so limited.

"[T]o determine whether a challenged rule exceeds an agency's statutory authority, we may consider only the wording of the rule itself (read in context) and the statutory provisions authorizing the rule." *Free Oregon, Inc. v. Oregon Health Authority*, 329 Or App 460, 466, 541 P3d 897 (2023) (internal quotation marks and citations omitted). We examine whether in adopting the rule the agency "'departed from

a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute.'" *Assn. of Acupuncture*, 260 Or App at 678 (quoting *Planned Parenthood Assn.*, 297 Or at 565). To determine whether an administrative rule conflicts with an applicable statute, we engage in our usual statutory construction analysis and ascertain the legislature's intent by examining the text, context, and pertinent legislative history of the relevant statutes. *Free Oregon, Inc.*, 329 Or App at 466.

    1.  *The rules on their face do not contravene ORS 427.007(1)(a) and ORS 430.662(1)(a)(A) and (B).*

    We begin with petitioners' arguments that the rules contravene ORS 427.007(1)(a) and ORS 430.662(1)(a)(A) and (B).

    More specifically, petitioners argue that the rules are invalid because they contravene the policy directives expressed in ORS 427.007(1)(a) and ORS 430.662(1)(a)(A) and (B) because those statutes require ODHS to provide services in any living setting by any provider chosen by the individual with developmental disabilities. Considering the text and context of those statutes, we disagree with petitioners that the rules are invalid.

    ORS 427.007(1)(a) provides:

> "Individuals with intellectual or developmental disabilities and society as a whole benefit when the individuals exercise choice and self-determination, living \*\*\* in the most integrated community settings appropriate to their needs, with supportive services that are designed and implemented consistent with the choice of the individuals regarding services, providers, goals and activities."

ORS 430.662(1)(a)(A) and (B) provide that, in carrying out the ORS 427.007(1)(a) directive, ODHS, "subject to the availability of funds, shall" ensure that "[p]ersons with intellectual or developmental disabilities have the supports necessary to reside in the setting that they choose;" and that "[a]ll persons with intellectual or developmental disabilities who are eligible for developmental disability services have access to the services." According to petitioners, ODHS is violating that statutory mandate because the rules do not allow

individuals living in provider-owned or -rented dwellings to receive CLS in the setting that they choose by the provider that they choose.[2] In effect, petitioners assert that ODHS exceeds its statutory authority if it places any limitations on where CLS may be provided and by whom because it is obligated by statute to fund services in any setting by any provider preferred by the individual.[3]

We conclude that petitioners' interpretation of ODHS's statutory authority is untenable and that the rules do not conflict with ORS 427.007(1)(a) and ORS 430.662 (1)(a)(A) and (B). Beginning with its text, ORS 427.007 (1)(a) expresses a policy that society benefits when individuals with disabilities live "in the *most integrated community settings appropriate to their needs*, with supportive services that are designed and implemented *consistent with the choice of the individuals* regarding services, providers, goals and activities." (Emphases added.) Considering that text, to the extent that ORS 427.007(1)(a) requires or forbids ODHS from taking any specific actions, it does not mandate that ODHS provide services in the exact setting or pay for services given by the exact provider desired by the individual. In fact, it explicitly does not: ODHS must provide services in the most integrated setting *appropriate* to the individual's needs and *consistent* with their preferences; ORS 427.007(1)(a) does not require ODHS to provide services in any living setting by any provider based solely on the preference of the adult.[4] Thus, the text of ORS 427.007(1)(a) does

---

[2] Petitioners also argue that, in disallowing an individual with developmental disabilities from receiving CLS funding if the setting that they choose is provider-owned or -rented, "individuals with developmental disabilities who have been renting from caregivers (or spouses of caregivers), now will have to choose between (1) giving up their [CLS benefits] (and, then, very likely needing to be institutionalized) or (2) mov[ing] out. That is not a choice that [ODHS] has the authority to force people into." Petitioners did not develop that argument and, even if they had, how the rule may function and what effect it may have in particular factual situations is not a proper consideration in an ORS 183.400 facial rule challenge. *Schlip v. Oregon Fish & Wildlife Comm.,* 75 Or App 462, 467, 707 P2d 606 (1985) (the efficacy of challenged rules is not subject to ORS 183.400 review).

[3] We note that petitioners do not appear to argue that ODHS does not have the authority to require the persons providing services to be licensed or otherwise qualified.

[4] Whether a provider-owned or -rented dwelling is the most appropriate setting for a specific individual requires factual analysis and is not properly considered in a facial rule challenge.

not, on its face, support petitioners' position that ODHS is unequivocally required to fund CLS in any living setting by any provider preferred by the individual.

The text of ORS 430.662(1)(a)(A) and (B), read in isolation, might better support petitioners' position; however, we do not read statutes in isolation. *State v. Meek*, 266 Or App 550, 556, 338 P3d 767 (2014) ("Text, however, cannot be viewed in isolation, but must, instead, be considered in the totality of the statutory framework."). ORS 430.662 (1)(a)(A) and (B) provide how ODHS is to "carry[ ] out the legislative policy declared in ORS 427.007." ORS 427.007 qualifies ODHS's responsibilities. We see no reason to believe that the legislature intended ORS 430.662(1)(a)(A) and (B) to impose the absolute restrictions advocated by petitioners when the statute that it was enacted to carry out specifically does not.

Additionally, and importantly, the statutes' context supports the interpretation that the legislature did not intend to prohibit ODHS from placing limitations on CLS eligibility in provider-owned or -rented living settings even if the individual wishes to both live in that setting and receive services from that provider. "[W]e do not look at one subsection of a statute in a vacuum; rather, we construe each part together with the other parts in an attempt to produce a harmonious whole." *Lane County v. LCDC*, 325 Or 569, 578, 942 P2d 278 (1997). Although ORS 427.007 (1)(a) and ORS 430.662(1)(a)(A) and (B) require ODHS to provide certain services in the community, ODHS is also statutorily required to ensure that those services are provided safely and appropriately. The same statute that provides ODHS with the authority and obligation to provide developmental disability services also authorizes and requires it to license and regulate the "individuals, facilities, institutions and programs" that provide services. ORS 409.010(2)(f); *see Barsky v. Bd. of Regents of Univ.*, 347 US 442, 449, 74 S Ct 650, 98 L Ed 829 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all

professions concerned with health."). In carrying out that function, the legislature mandated that ODHS license and regulate "any family home or facility in which residential care is provided in a homelike environment for five or fewer adults who are not related to the provider by blood or marriage." ORS 443.705(1) (defining adult foster home).

~~Provider-owned or -rented dwellings, such as petitioners', meet the definition of an adult foster home, and petitioners have not convinced us otherwise.[5] However, they are not licensed. An unlicensed setting is not regulated nor subject to inspections or investigations in a manner consistent with other, licensed, identical settings. The legislature has explicitly found that adult foster homes serve the same function as settings in which an individual is eligible for CLS with a family member: Adult foster homes "provide needed care and services to thousands of Oregonians who *** have disabilities and who might otherwise be institutionalized." ORS 443.720(1)(a). In additional findings, similarly to ORS 427.007, the legislature expressed that the "protection of the health, safety and well-being of the residents of adult foster homes is an important function of the licensing agency," that "[c]onsistent interpretation, application and enforcement of regulatory standards is necessary and desirable for the protection of adult foster home residents," and that the "licensing agency [must] take vigorous action to ensure that inspections and investigations are carried out as required by law." ORS 443.720(1)(b), (c), (2)(b).~~

---

[5] In their reply brief, petitioners rely heavily on exclusions from the definition of "residential facility" in ORS 443.405(10) to differentiate adult foster homes from their living settings. ORS 443.405(10) is inapplicable. *See* ORS 443.405 (definitions applicable to ORS 443.400 to 443.455 and ORS 443.991). Thus, we do not engage with petitioners' arguments regarding 24-hour care.

Petitioners also argue that the difference between a provider-owned or -rented dwelling and an adult foster home is that an individual receiving CLS in a provider-owned or -rented dwelling has a choice of provider while an individual in an adult foster home does not. That differentiation does not help petitioners. The definition of adult foster home does not turn on whether the residents have a choice of provider—it turns on what control the provider has over the living setting. If an individual wishes to receive CLS, they may exercise their choice to employ a different provider than the person or entity that controls the dwelling. If they wish to continue receiving services from their unrelated provider that owns or controls the dwelling, the provider may obtain a license to operate an adult foster home.

Thus, the legislature has specifically directed ODHS to license and regulate the living environment at issue—a dwelling owned or rented by a provider who is unrelated to the beneficiary, providing services including assisting in accomplishing activities of daily living—as adult foster homes. *See* ORS 443.705(1) - (5) (ODHS must license adult foster homes); ORS 443.725. The legislature established a differentiation between related and unrelated providers being paid to provide services and who control the living setting. Interpreting the statutes as petitioners urge would require ODHS to violate its statutory mandate to license and regulate adult foster homes and ignore the legislature's choice to treat related and unrelated providers differently. That result is unsustainable. *See State v. Guzek*, 322 Or 245, 268, 906 P2d 272 (1995) ("[W]hen one statute deals with a subject in general terms and another deals with the same subject in a more minute and definite way, the two should be read together and harmonized, if possible, while giving effect to a consistent legislative policy."). Or, viewed a slightly different way, to read ODHS's obligations as petitioners argue would require ODHS to forego enforcing adult foster home licensing requirements because it would require ODHS to fund services in an unlicensed home, something that we will not presume the legislature intended to do. *Carlson v. Myers*, 327 Or 213, 226, 959 P2d 31 (1998) (the "correct analytical route for this court is to avoid the statutory interpretation that would produce irreconcilable conflict"). Accordingly, ODHS is mandated to regulate settings in which adults live with their unrelated providers, such as petitioners, and ORS 427.007(1)(a) and ORS 430.662(1)(a)(A) and (B) do not require anything different.[6]

---

[6] We also understand petitioners to argue that the rules run afoul of ODHS's statutory mandates because they will necessarily result in individuals who are currently living in provider-owned or -rented dwellings losing developmental disability services altogether, violating ODHS's duty to provide services to qualified individuals in the state. However, the rules do not exclude individuals from receiving all developmental disability services; the rules require that, to receive funding for services through a particular Medicaid program, the individual cannot live in a home that violates ODHS's licensing requirements, consistently with its statutory obligations. An individual may still receive developmental disability services while living in a dwelling owned or rented by a provider that is unrelated to them—but the setting must be licensed.

2.   *The rules on their face do not contravene ORS 427.121(2).*

Petitioners next argue that the rules contravene ORS 427.121(2) for the same reason: ODHS is required to fund services in any setting and from any provider preferred by the individual. We once again apply our standard statutory interpretation methodology and conclude that the rules do not contravene ORS 427.121(2).

ORS 427.121(2) provides that an adult with a developmental disability "has the right to choose the adult's community living setting," and that ODHS must present to the adult "at least three types of community living settings, including an option for services in the adult's own or family home," yearly or when the adult is considering moving from one community living setting to another. "Community living setting" is defined as a "residential setting"; the adult's own home or the home of the adult's family; or an "other nonresidential setting." ORS 427.101(1). As relevant here, "residential setting" means licensed residential facilities, licensed adult foster homes, group homes, and supported living programs. ORS 427.101(7).

Considering the text of the statute, read together with the statutory definitions of its text, it is unclear how ODHS's decision to exclude from CLS benefits unlicensed homes owned by unrelated providers is inconsistent with ORS 427.121(2). That statute requires ODHS to provide an adult with the choice to live in their own home or a family member's home, a licensed or otherwise regulated residential setting, or a nonresidential setting. The statute does not require ODHS to provide the adult with the choice to live anywhere they wish, nor in an unlicensed home with an unrelated provider. Therefore, the rules do not conflict with ORS 427.121(2).

3.   *The rules on their face do not contravene federal Medicaid law.*

The text of the Medicaid statutes and regulations cited by petitioners face the same textual difficulties as the above Oregon statutes. Federal rules of statutory construction govern the interpretation of federal statutes, which

includes examining the text, structure, and legislative history. *Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 377-78, 213 P3d 1164 (2009); *see, e.g.*, *Dept. of Revenue of Or. v. ACF Industries*, 510 US 332, 339-46, 114 S Ct 843, 127 L Ed 2d 165 (1994) (examining text, structure, and legislative history of federal statute). Petitioners point to a variety of Medicaid mandates applicable to the K Plan, but none of those require that ODHS provide CLS in any setting chosen by the individual, regardless of state licensing and regulatory requirements, nor forbid ODHS from regulating and limiting an individual's choice in settings. For example, like ORS 427.121(2), Medicaid mandates that the individual have the freedom to choose "among setting options," but those options do not necessarily include any and all possible physical locations regardless of state regulations. 42 CFR § 441.530(a)(1)(ii) (the "setting is selected by the individual from among setting options"). Additionally, Medicaid does not mandate that the state approve any and all preferences of the individual regardless of state regulations, rather that the state must make available options that "[*f*]*acilitate*[] individual choice regarding services and supports, and who provides them." 42 CFR § 441.530(a)(1) (v) (emphasis added). None of the statutes or regulations identified by petitioners forbid ODHS from placing limitations on the individual's choice of setting or require ODHS to approve any living situation that the individual prefers. *See* 42 USC § 1396n(k)(1)(A)(iv) (requiring that "home and community-based attendant services" are "selected, managed, and dismissed by the individual" and are "controlled, to the *maximum extent possible*, by the individual" (emphasis added))[7]; 42 USC § 1396n(k)(3)(B) (requiring states to provide "consumer controlled home and community-based attendant services and supports to individuals" in the "*most integrated setting appropriate* to the individual's needs,

---

[7]   Petitioners read 42 USC section 1396n(k)(1)(A)(iv) to require that the individual select, manage, dismiss, and control the "home or community setting" in which the services are provided, 42 USC § 1396n(k)(1)(A)(ii), but we understand subclauses (iv)(I) and (II) to refer to the "home and community-based attendant services and supports," rather than the setting. 42 USC § 1396n(k)(1)(A)(iv) ("The state shall make available home and community-based attendant services and supports to eligible individuals *** the furnishing of which *** is selected, managed, and dismissed by the individual *** [and] is controlled, to the maximum extent possible, by the individual[.]").

and without regard to the individual's age, type or nature of disability, severity of disability, or the form of home and community-based attendant services and supports that the individual requires in order to lead an independent life" (emphasis added))[8]; 42 USC § 1396n(k)(3)(D)(ii) (state must "establish and maintain a comprehensive, continuous quality assurance system" that "maximizes consumer independence and consumer control").

Thus, having considered the federal Medicaid statutes identified by petitioners, we conclude that ODHS did not exceed its statutory authority in promulgating the rules on that basis.

### 4. *Fair Housing Act*

Finally, petitioners argue that the rules violate the federal Fair Housing Act (FHA). We disagree. The FHA prohibits discrimination in the sale or rental of dwellings based on, as relevant here,[9] a buyer or renter's disability, the disability of a person residing or intending to reside in the dwelling, or the disability of any person associated with the buyer or renter. 42 USC § 3604. "[A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under [the FHA] shall to that extent be invalid." 42 USC § 3615. Petitioners argue that the rules violate the FHA because they restrict a person's opportunity

---

[8] Petitioners seemingly argue that 42 USC section 1396n(k)(3)(B) requires ODHS to provide services without regard to the "form of home," presumably meaning the setting, along with the "community-based attendant services." We reject that argument because the clause "home and community-based attendant services" as a whole refers to the services, not to the setting and the services.

[9] In their reply brief, petitioners argue that the rules discriminate based on an individual's "familial status," which is prohibited by the FHA. 42 USC § 3604. However, under the FHA, "familial status" refers to housing discrimination against individuals with children and is therefore inapplicable here. 42 USC § 3602(k) (defining "familial status"). To the extent that petitioners intend to argue that the rules discriminate based on an individual's marital status, that is not a protected characteristic under the FHA.

Further, to the extent that the rules treat individuals differently depending upon their familial relationship with the provider, we note that adults receiving services can reside with an unrelated provider if the provider obtains the appropriate license for the living setting, if the provider does not own or control the property, or if the adult and provider have "equal homeowner or rental property rights." OAR 411-450-0070(1)(b).

to use, rent, and enjoy dwellings by receiving CLS based upon disability and force individuals who currently live in an unrelated provider-owned or -rented dwelling to move or cease receiving CLS.[10]

On their face, the rules do not restrict where an individual chooses to live based upon their disability, nor do they discriminate in housing choices based upon the disability of anyone associated with the person. The rules determine eligibility for specific Medicaid benefits depending upon whether the person receiving payment for providing services also controls the housing and whether the living setting is licensed; they do not base housing decisions on the individual's disability or the disability of anyone associated with them.

Accordingly, petitioners have not shown that ODHS exceeded its statutory authority by enacting OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35), nor that the rules, on their face, conflict with any statutory obligations under state or federal law.[11]

B. *The rules do not violate the Oregon or United States constitutions.*

Having rejected petitioners' contention that ODHS exceeded its statutory authority in adopting OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35), we turn to petitioners' contention that the rules violate Article I, section 20, of the Oregon Constitution (the Equal Privileges and Immunities Clause) and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Petitioners argue that the rules create a class of individuals with developmental disabilities that can continue to receive CLS and discriminate against a class of individuals with developmental disabilities who cannot due to their chosen

---

[10] Petitioners also assert that the rules require caregivers that own or rent dwellings to "either ask a potential tenant about their disability status and violate the Fair Housing Act, or keep quiet and risk their potential tenants losing eligibility in the [CLS] program." We reject that argument as undeveloped.

[11] We do not address petitioners' argument that Senate Bill (SB) 1548 (2022) did not provide ODHS with the authority to "prohibit individuals from choosing where they want to live" because, as explained, ODHS did not exceed its statutory authority, regardless of SB 1548.

living setting. We conclude that the rules do not violate either constitutional provision.

We begin with an overview of the two clauses at issue. The Equal Privileges and Immunities Clause of the Oregon Constitution guarantees that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." Under the federal Equal Protection Clause, no state shall "deny to any person within its jurisdiction the equal protection of the laws." "Although both those provisions involve questions of equality, * * * [w]e have described Oregon's Equal Privileges and Immunities Clause as the 'antithesis' of the federal Equal Protection Clause: The latter was adopted to prevent the government from unfairly *disadvantaging* classes, while the former was adopted to prevent the government from unfairly *favoring* classes." *Delta Air Lines, Inc. v. Dept. of Rev.*, 374 Or 58, 76, 573 P3d 856 (2025), *cert den*, 223 L Ed 2d 517 (Jan 12, 2026) (emphasis in original). "Under both, most classifications will be held constitutional on very minimal showings." *Id.* However, both provisions recognize some classifications as "suspect"—"such as race, alienage, or national origin"—requiring very strong justification for the classification to be held constitutional. *Id.* at 76-77 (affirming that a classification is "'suspect' when it focuses on 'immutable' personal characteristics," which "can be suspected of reflecting 'invidious' social or political premises, that is to say, prejudice or stereotyped prejudgments" (quoting *Hewitt v. SAIF*, 294 Or 33, 45, 653 P2d 970 (1982))).

Assuming that the categories of individuals with developmental disabilities receiving CLS services are "classes," we understand the rules to distinguish those classes based on their living arrangements. *See Moccio v. AFSD*, 103 Or App 207, 213, 796 P2d 1233 (1990) (administrative rule establishing eligibility standard for Aid to Dependent Children (ADC) benefit that provides benefit to children who live with a related caretaker but not to children who do not creates two "true" classes based on "living arrangements"); *see also Wasson v. Fagan*, 328 Or App 813, 816, 538 P3d 911 (2023) ("Assuming the categories of voters

identified in OAR 165-014-0005(5) amount to 'classes,' they are distinguished by geographical location \*\*\*."). Thus, the class is not suspect because it is "based on living arrangements, not immutable characteristics," *Moccio*, 103 Or App at 213, and therefore "our analysis should apply the most lenient standards that exist under both state equal privileges and immunities law and federal equal protection law," that is, "rational basis," *Delta Air Lines*, 374 Or at 77.[12] *See also Crocker and Crocker*, 332 Or 42, 55, 22 P3d 759 (2001) ("Marital status is not an immutable trait."). "In keeping with our traditional practice, we first consider the Oregon Constitution's Equal Privileges and Immunities Clause before we turn to the federal Equal Protection Clause." *Delta Air Lines*, 374 Or at 77.

C.  *Article I, section 20, of the Oregon Constitution*

We begin with the state constitution. As noted, the Equal Privileges and Immunities Clause of the Oregon Constitution guarantees that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." When a case does not involve a "suspect" class, "the test is whether the classification is rationally related to a legitimate government purpose." *Delta Air Lines*, 374 Or at 77. We conclude that the classification is rationally related to the legitimate state purpose of regulating developmental disability services for the health and safety of its recipients.

As already explained, ODHS is statutorily mandated to protect the health and safety of individuals in

---

[12] Petitioners argue that the rules discriminate on the basis of blood, marriage, or adoption. However, in a comparable although not identical factual circumstance, we determined regarding a rule that provided certain benefits to children only if they lived with a caretaker that was related to them, and not if the caretaker was unrelated, that the differentiating factor between the classes was that of living arrangement. *Moccio*, 103 Or App at 213. Further, petitioners do not grapple with the fact that the legislature, not ODHS, created that distinction. As already explained, "adult foster home" is defined by statute as "any family home or facility in which residential care is provided in a homelike environment for five or fewer adults *who are not related to the provider by blood or marriage*." ORS 443.705(1) (emphasis added). Whether that distinction is wise, necessary, or supported by evidence is not a question before us in an ORS 183.400 proceeding. Petitioners do not challenge the statutes that establish a differentiation between related and unrelated providers, and there is no reason to conclude that, by enforcing those statutes, the rules are facially discriminatory on that basis.

its care. The legislature imposed additional oversight and licensure requirements on living settings owned by a provider that is unrelated to the adult receiving services in the form of adult foster homes. The legislature could rationally determine that unrelated provider-owned or -rented settings require greater oversight than those owned by a family member of the adult to ensure that they do not retain the qualities of an institution and to ensure that the living setting does not present health or safety concerns. The rules at issue serve to enforce that legitimate government interest by explicitly closing a loophole that seemingly allowed unlicensed adult foster homes to operate while obtaining payment.

Thus, because the classification is rationally related to a legitimate government purpose, OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35) do not violate Article I, section 20.

D.  *Equal Protection Clause of the Fourteenth Amendment to the United States Constitution*

Under the Equal Protection Clause, no state shall "deny to any person within its jurisdiction the equal protection of the laws." "The provision is, in essence, a direction that all persons similarly situated be treated alike." *Walter v. Board of Education*, 301 Or App 516, 528, 457 P3d 288 (2019). Although we have determined that the rules do not differentiate based on a suspect class and, therefore, are subject to rational basis scrutiny, under the federal Equal Protection Clause, a rule may also be more strictly scrutinized if it "impinges upon a fundamental right explicitly or implicitly protected by the Constitution[.]" *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 US 1, 17, 93 S Ct 1278, 36 L Ed 2d 16 (1973).

We understand petitioners to argue that the rules impinge on the right to "freedom of intimate association," which is constitutionally protected under Fourteenth Amendment due process. *NAAP v. California Bd. of Psychology*, 228 F3d 1043, 1050 (9th Cir 2000), *cert den*, 532 US 972 (2001) ("It is true that the Fourteenth Amendment protects some personal relationships, such as those that

attend the creation and sustenance of a family and other highly personal relationships." (Internal quotation marks and citation omitted.)). Petitioners assert that the relationship between some unrelated providers and the adults receiving services are so close as to be constitutionally protected, but that freedom protects only certain types of relationships. *Roberts v. United States Jaycees*, 468 US 609, 620, 104 S Ct 3244, 82 L Ed 2d 462 (1984) (There exists a "broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments."). We are not convinced that the relationship between a provider and an adult receiving services is facially in and of itself one that gains constitutional protection. *See NAAP*, 228 F3d at 1050 ("The relationship between a client and a psychoanalyst lasts only as long as the client is willing to pay the fee. Even if analysts and clients meet regularly and clients reveal secrets and emotional thoughts to their analysts, these relationships simply do not rise to the level of a fundamental right." (Internal quotation marks and citation omitted.)). Thus, even if the relationships between some unrelated providers and adults receiving services are entitled to constitutional protection in the same manner as a familial relationship, that determination requires a case-by-case assessment and is not reviewable in a facial rule challenge under ORS 183.400. *See AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992), *abrogated in part by GTE Northwest, Inc. v. Public Utility Commission*, 321 Or 458, 900 P2d 495 (1995), *cert den*, 517 US 1155 (1996) ("Numerous individual fact situations can arise under any rule, but judicial review of the rule as applied to each of those situations is reserved to other forums.").

Perhaps most importantly, petitioners do not explain how the rules forbid association between the adult and anyone. On their face, the rules forbid a living situation with potentially conflicting priorities without ODHS oversight.

"'[M]ost federal courts have held that a patient does not have a constitutional right to \*\*\* obtain treatment from a particular provider if the government has reasonably prohibited that \*\*\* provider,'" *NAAP*, 228 F3d at 1050 (quoting *Mitchell v. Clayton*, 995 F2d 772, 775 (7th Cir 1993)), and we see no reason to conclude otherwise in this case. The rules do not forbid an adult from living or associating with anyone; the rules require providers to submit to certain oversight and licensure requirements.

Finally, although we have determined that, on their face, the rules do not differentiate based on a suspect classification, and they do not interfere with a fundamental constitutional right, we must still examine the rules to determine whether they rationally further "some legitimate, articulated state purpose and therefore [do] not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *San Antonio Indep. Sch. Dist.*, 411 US at 17. We conclude that OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35) do not violate the federal Equal Protection Clause for the same reasons that they do not violate Article I, section 20.

OAR 411-450-0060(6) and OAR 411-450-0020(34) and (35) held valid.